## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **MELINDA S. SUTTON,** | ) | |
| Plaintiff | ) | |
| | ) | Civil Action No. 2:20cv00008 |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| **ANDREW M. SAUL,** | ) | |
| **Commissioner of Social Security,** | ) | By:  PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

### I. Background and Standard of Review

Plaintiff, Melinda S. Sutton, ("Sutton"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying her claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966).  "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "'substantial evidence.'"" *Hays v. Sullivan*, 907

F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Sutton protectively filed her application for DIB[1] on April 18, 2017, alleging disability as of February 28, 2016, based on vision problems resulting from Graves' disease; osteoporosis; neuropathy of the hands and feet; stomach issues; anxiety; depression; history of blood clots; and lifting difficulties resulting from shoulder surgery and a hysterectomy. (Record, ("R."), at 10, 200-01, 218.) The claim was denied initially and upon reconsideration. (R. at 101-03, 106-10, 112-14.) Sutton then requested a hearing before an administrative law judge, ("ALJ"). (R. at 115-16.) The ALJ held a hearing on December 7, 2018, at which Sutton was represented by counsel. (R. at 38-68.)

By decision dated April 25, 2019, the ALJ denied Sutton's claim. (R. at 10-25.) The ALJ found that Sutton met the nondisability insured status requirements of the Act for DIB purposes through March 31, 2019. (R. at 12.) The ALJ found that Sutton had not engaged in substantial gainful activity during the period from her alleged onset date of February 28, 2016, through her date last insured of March 31, 2019.[2] (R. at 12.) The ALJ determined that, through the date last insured, Sutton had severe impairments, namely history of left shoulder surgery; neuropathy in her hands and feet; headaches; back pain; and diarrhea, but he found that Sutton did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 12, 15.) The ALJ found that, through the date last insured,

---

[1] Sutton previously filed a claim for DIB, which was denied at the initial level on April 14, 2015. (R. at 214.) There is no indication in the record that Sutton pursued this claim further.

[2] Therefore, Sutton must show that she was disabled between February 28, 2016, the alleged onset date, and March 31, 2019, the date last insured, in order to be eligible for benefits.

Sutton had the residual functional capacity to perform light[3] work that required no more than occasional postural activities, but no climbing of ladders, ropes or scaffolds; that required no more than occasional pushing and pulling; that required no more than frequent fingering and feeling; that required no more than frequent reaching with the left upper extremity, but no overhead reaching with the left upper extremity; and that did not require concentrated exposure to vibrations and industrial hazards. (R. at 16.) The ALJ found that, through the date last insured, Sutton was able to perform her past relevant work as an office manager. (R. at 23.) In addition, based on Sutton's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that, through the date last insured, a significant number of other jobs existed in the national economy that Sutton could perform, including the jobs of a laundry worker, a mail clerk and an office helper. (R. at 23-24.) Thus, the ALJ concluded that, through the date last insured, Sutton was not under a disability as defined by the Act and was not eligible for DIB benefits. (R. at 25.) *See* 20 C.F.R. § 404.1520(f), (g) (2020).

After the ALJ issued his decision, Sutton pursued her administrative appeals, (R. at 196-99), but the Appeals Council denied her request for review. (R. at 1-5.) Sutton then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2020). This case is before this court on Sutton's motion for summary judgment filed November 20, 2020, and the Commissioner's motion for summary judgment filed December 21, 2020.

---

[3] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2020).

*II. Facts*

Sutton was born in 1963, (R. at 41, 200), which classifies her as a "person of advanced age" under 20 C.F.R. § 404.1563(e). She has some college education and specialized training as a certified nurse's assistant, ("CNA"). (R. at 42, 219.) Sutton has past work experience as a home healthcare assistant and a secretary/office manager. (R. at 42-43.) Sutton testified that, on average, she was missing work one day a week and having to leave early two to three times a week due to chronic diarrhea, depression and back, shoulder and hand pain. (R. at 44-45, 48.) She stated that she had been counseled about being off task and having to miss work. (R. at 46.) Sutton stated that she experienced several panic attacks a day while working. (R. at 48.) When asked about taking care of her father, Sutton stated that she merely sat with her father and comforted him.[4] (R. at 54.) When the ALJ pointed out that she had previously reported cooking, cleaning and managing his medication, Sutton stated that she just made sure he ate and took his medication, but still admitted to cooking meals for him and making his bed. (R. at 55.) When asked more about her prior report of not allowing her father to do much on his own, Sutton stated that her granddaughter would help and that she would drive her father places. (R. at 55-56.)

Asheley Wells, a vocational expert, also was present and testified at Sutton's hearing. (R. at 60-66.) Wells was asked to consider a hypothetical individual of Sutton's age, education and work experience who could perform light work that required no more than occasional postural activities, but no climbing of ladders, ropes or scaffold; who could frequently finger and feel objects; who could perform

---

[4] Sutton reported to a behavioral health counselor on October 2, 2017, that she cooked and cleaned for her father, and reported to an emergency department physician in February 2018 that she had cleaned her father's house the day before her emergency department visit. (R. at 741, 936.)

no overhead reaching with the left upper extremity, but frequent reaching otherwise with the left upper extremity; who could occasionally push and pull; and who should avoid concentrated exposure to vibrations and industrial hazards. (R. at 61.) She stated that such an individual could perform Sutton's prior jobs. (R. at 61.) Wells also stated that such an individual could perform other work that existed in significant numbers, including jobs as a laundry worker, a mail clerk and an office helper. (R. at 61-62.) When asked if the same hypothetical individual also could understand, remember and carry out simple instructions and perform simple tasks with only occasional interaction with others, Wells stated that Sutton's prior work would be eliminated, but the previously identified jobs would be available. (R. at 62.) When asked if the individual would be off task more than 10 percent of an eight-hour workday and would be absent from work more than one day per month, Wells testified that all employment would be precluded. (R. at 62-63.)

Wells then was asked to consider the first hypothetical individual, but who would be limited to sedentary[5] work. (R. at 63.) She stated that such an individual would not be able to perform Sutton's prior work. (R. at 63.) Wells stated that Sutton's prior work allowed for transferable skills; thus, such an individual could perform sedentary work that existed in significant numbers, including semi-skilled jobs such as a receptionist and a data entry clerk. (R. at 63-64.) When asked to consider the same hypothetical individual, but who could understand, remember and carry out simple instructions and perform simple tasks with only occasional interaction with others, Wells stated that there would be no transferable skills. (R. at 64-65.)

---

[5] Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking or standing is often necessary in carrying out job duties. Jobs are sedentary if walking or standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2020).

Wells stated that there would be no jobs available should the first hypothetical individual be limited to only occasional use of the upper extremities. (R. at 65.) When presented with an individual who was limited to 15 minutes of continuous use of a computer screen, who required break periods of up to 15 minutes before she could resume screen time, and who required up to eight bathroom breaks lasting up to 15 minutes each, she stated that there would be no jobs available. (R. at 65-66.)

In rendering his decision, the ALJ reviewed medical records from Richard Luck, Ph.D., a state agency psychologist; Dr. Robert McGuffin, M.D., a state agency physician; Linda Dougherty, Ph.D., a state agency psychologist; Dr. Daniel Camden, M.D., a state agency physician; Mountain States Medical Group, ("Mountain States"); Dickenson Community Hospital; Norton Community Hospital; The Health Wagon; Mountain View Regional Medical Center, ("Mountain View"); Buchanan General Hospital; Dickenson County Behavioral Health; Michigan Medicine; and Melinda M. Fields, Ph.D., a licensed psychologist.

On October 1, 2015, Sutton was seen at The Health Wagon to re-establish care. (R. at 561-63.) Upon examination, Sutton had chronic painful joints; her extremities had no clubbing, cyanosis or edema; her peripheral pulses were normal; and she had good eye contact and clear speech. (R. at 562.) On December 21, 2015, Sutton presented to the emergency department at Dickenson Community Hospital for complaints of lower back pain. (R. at 452-65.) She was diagnosed with low back pain and dysuria. (R. at 463.)

On July 5, 2016, Sutton presented to the emergency department at Mountain View for complaints of headaches and dizziness. (R.  at 590-94.) A CT scan of

Sutton's head was normal. (R. at 581.) Sutton's examination was normal, except for abnormal coordination. (R. at 593.) Her mood, affect and behavior were reported as normal, although she was emotional and reported depression over the recent death of her mother. (R. at 593-94.) Sutton was encouraged to establish care for management of depression with her primary care physician. (R. at 594.) Sutton next sought emergency medical attention on September 28 and 29, 2016, for abdominal pain. (R. at 444-51, 594-98.) Sutton's bowel sounds were normal; her abdomen had no distension; she had suprapubic tenderness; she had full range of motion; she had no edema; and she had an appropriate mood. (R. at 445, 597.) On September 29, 2016, Sutton denied behavioral problems and confusion; constipation and diarrhea; and back, muscle and joint pain. (R. at 596.) A CT scan of Sutton's abdomen showed a small umbilical hernia and a few slightly prominent lymph nodes along the deep pelvic sidewall, bilaterally, but not specific. (R. at 450.) She was diagnosed with flank pain, colonic spasm and interstitial cystitis. (R. at 445, 597.)

On November 16, 2016, Sutton saw Tauna Gulley, F.N.P., a family nurse practitioner with The Health Wagon, reporting anxiety due to the recent death of her mother. (R. at 551-53.) She also reported that she cared for her father and was depressed at times. (R. at 551.) Gulley reported that Sutton had full range of motion and no swelling or deformity upon musculoskeletal examination; she was pleasant and cooperative; she made good eye contact; and she spoke clearly. (R. at 551.)

On December 1, 2016, Sutton presented to the emergency department for complaints of dysuria. (R. at 598-602.) A CT scan of Sutton's abdomen showed stool in the ascending colon and cecum. (R. at 587, 602.) Upon examination, Sutton had normal bowel sounds; her abdomen exhibited no distension; she had

tenderness to palpation over the suprapubic area and the right flank; she had normal range of motion; and her mood, affect and behavior were normal. (R. at 600-01.) Sutton was diagnosed with flank pain and constipation. (R. at 601.)

On December 14, 2016, Sutton saw Ramona Boyd, a family nurse practitioner at The Health Wagon, for complaints of stress-related headaches. (R. at 547-49.) She denied abdominal pain; diarrhea; joint pain and stiffness; shoulder pain; difficulty balancing; and problems with coordination; anxiety; and depression. (R. at 547-48.) Boyd reported that Sutton was alert, oriented and had intact cognitive function. (R. at 548.) She diagnosed chronic cluster headaches, intractable. (R. at 548.)

On March 21, 2017, Sutton presented to the emergency department for complaints of bilateral leg pain and burning and headaches. (R. at 602-06.) Sutton reported that she had been under a lot of stress. (R. at 602.) She denied visual disturbance; abdominal pain; diarrhea; nausea; vomiting; arthralgias; back pain; myalgias; stiffness; behavioral problems and confusion. (R. at 604.) Sutton's musculoskeletal examination was normal, except she exhibited some tenderness; and her mood, affect and behavior were normal. (R. at 605.) She was diagnosed with acute nonintractable headache, unspecified headache type; and pain in both lower extremities. (R. at 606.) On April 6, 2017, Sutton presented to the emergency department at Buchanan General Hospital for complaints of headaches. (R. at 886-91.) A CT scan of Sutton's head was unremarkable. (R. at 884-85.) Examination of Sutton's back was normal; her extremities had normal range of motion and no lower extremity edema; her mood and affect were normal; her speech was normal; and she had no motor or sensory deficit. (R. at 887.) Sutton was diagnosed with episodic, poorly-controlled tension headache, which was resistant to treatment, and chronic temporomandibular joint, ("TMJ"), syndrome.

(R. at 888.) It was recommended that Sutton perform no strenuous activity. (R. at 888.)

On May 3, 2017, Sutton complained of burning and pain in her feet and legs and depression since the death of her mother. (R. at 674-76.) Sutton also reported that she had diarrhea daily. (R. at 674.) Gulley reported that Sutton was well-hydrated and in no distress; her back had no tenderness; her knees had crepitus; she had full range of motion of her extremities with no edema; she was alert and cooperative; she had a normal gait; she made good eye contact; her cognitive function was intact; her speech was clear; and she had a depressed mood. (R. at 674-75.) Gulley diagnosed hypothyroidism; insomnia; depressive disorder, not elsewhere classified; and right knee pain. (R. at 675.) In June 2017, Sutton complained of bilateral knee pain with crepitus; left shoulder pain; chronic diarrhea; anxiety; and depression. (R. at 690, 732.) Gulley reported that Sutton's back had tenderness to palpation over the lumbar-sacral spine; she had paraspinal muscle spasm on both sides; she had crepitus in her knees; she had limited range of motion of the left shoulder; and her gait was normal. (R. at 690-91, 732-33.) Although Sutton complained of chronic diarrhea, her abdominal examination was normal, and she was not dehydrated. (R. at 690, 732.) Gulley diagnosed hypothyroidism; left knee pain; left shoulder pain; and adjustment disorder with depressed mood. (R. at 691, 733.)

On June 29, 2017, Richard Luck, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating that Sutton had mild limitations in her ability to understand, remember or apply information, to interact with others and to concentrate, persist or maintain pace. (R. at 74-75.) He opined that Sutton had no limitations on her ability to adapt or manage herself. (R. at 75.) Luck concluded Sutton's anxiety and obsessive-compulsive disorders

and depressive, bipolar and related disorders were nonsevere. (R. at 74-75.) To support his findings, Luck noted that the record indicated that Sutton had been treated by her primary care physician for anxiety and depression due to her mother's death; her overall mental status evaluations were normal; she reported stress from financial and physical issues related to her mother's death, but denied the need for mental health follow up; she was able to care for her disabled husband; she attended social events with family; and she could take care of her personal needs, prepare meals and perform light chores. (R. at 75.)

On June 30, 2017, Dr. Robert McGuffin, M.D., a state agency physician, completed a medical assessment, indicating that Sutton had the residual functional capacity to perform medium[6] work. (R. at 76-77.) No postural, manipulative, visual, communicative or environmental limitations were noted. (R. at 77.)

On August 16, 2017, Sutton saw Gulley, requesting that she complete her disability forms. (R. at 730-31.) Sutton stated that she was seeking disability based on osteoporosis, Graves' disease and irritable bowel syndrome. (R. at 730.) Gulley reported that Sutton was well-hydrated and in no distress; her abdomen had no guarding or rigidity; her back had tenderness to palpation over the lumbar-sacral spine; she had paraspinal muscle spasm on both sides; she had crepitus in her knees; her hands were edematous and stiff with range of motion; she made good eye contact; her thought process was logical and goal directed; her thought content was without suicidal ideations and delusions; and her mood was depressed. (R. at 730-31.) Gulley diagnosed hypothyroidism and adjustment disorder with depressed mood. (R. at 731.)

---

[6] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, she also can do sedentary and light work. *See* 20 C.F.R. § 404.1567(c) (2020).

On August 24, 2017, Sutton presented to the emergency department for complaints of chest pain. (R. at 704-18.) Chest x-rays showed no acute cardiopulmonary disease. (R. at 718.) An EKG was normal, except for nonspecific T-wave abnormalities. (R. at 710, 712.) Sutton was diagnosed with chest pain. (R. at 713.)

On September 7, 2017, and October 2, 2017, Sutton attended behavioral health sessions, seeking disability benefits and treatment for depression due to her mother's death. (R. at 741-44, 747-51.) Sutton reported that her daily depression was the result of the recent death of her mother, her physical limitations and coping with being her father's sole support. (R. at 741.) She stated that she continued to take care of her father, including cooking, cleaning and making sure that he took his medications. (R. at 741, 750.) Sutton stated that she did not allow her father to do much on his own. (R. at 741, 750.) In addition, Sutton reported issues with her son who she believed was abusing medication. (R. at 750.) At her October 2017 appointment, Sutton reported that she did not want to work. (R. at 742.) James Counts, a qualified mental health professional, ("QMHP"), diagnosed major depressive disorder, recurrent, moderate. (R. at 743.) Sutton failed to keep her appointment on November 1, 2017. (R. at 740.) Thereafter, she discontinued her behavioral health sessions, stating that she would not go back. (R. at 1015.)

On November 16, 2017, Linda Dougherty, Ph.D., a state agency psychologist, completed a PRTF, indicating that Sutton had mild limitations in her ability to understand, remember or apply information, to interact with others and to concentrate, persist or maintain pace. (R. at 88-89.) She opined that Sutton had no limitations on her ability to adapt or manage herself. (R. at 89.) Dougherty concluded Sutton's anxiety and obsessive-compulsive disorders and depressive, bipolar and related disorders were nonsevere. (R. at 88-89.) To support her

findings, Dougherty noted that the record indicated that Sutton had been treated by her primary care physician for anxiety and depression due to her mother's death; her overall mental status evaluations were normal; she reported stress from financial and physical issues related to her mother's death, but denied the need for mental health follow up; she was able to care for her disabled husband; she attended social events with family; and she could take care of her personal needs, prepare meals and perform light chores. (R. at 89.)

On November 16, 2017, Dr. Daniel Camden, M.D., a state agency physician, completed a medical assessment, indicating that Sutton had the residual functional capacity to perform medium work. (R. at 90-91.) No postural, manipulative, visual, communicative or environmental limitations were noted. (R. at 91.) To support his findings, Dr. Camden noted that the record indicated that Sutton's medical examinations showed that her medical conditions were stable. (R. at 90.) Sutton's examinations showed that she had a normal gait, and her extremities displayed normal strength and range of motion. (R. at 90.) He noted that Sutton's activities of daily living did not show that she had significant limitations on her ability to lift items. (R. at 90.)

On December 13, 2017, Sutton reported left knee pain and unsteadiness, which caused her to fall frequently. (R. at 1033-35.) She reported "some" diarrhea that alternated with constipation. (R. at 1033.) Gulley reported that Sutton's back had tenderness to palpation over the lumbar-sacral spine; she had crepitus in her knees; her extremities had full range of motion and no edema; her gait was normal; she made good eye contact; and she spoke clearly. (R. at 1033-34.) On December 27, 2017, Sutton reported a recent fall after her knees "gave out." (R. at 1030-31.) She also reported low back pain, painful bilateral grip and diarrhea after eating. (R. at 1030.) Gulley reported that Sutton was well-hydrated and in no distress; her

abdomen had bowel sounds present, was soft and nontender; her lungs were clear; her back had tenderness to palpation over the lumbar-sacral spine; she had crepitus in her right knee; her gait was normal; her cognitive function was intact; she made good eye contact; her mood and affect had full range; and she spoke clearly. (R. at 1030.) Gulley diagnosed hypothyroidism; adjustment disorder with depressed mood; lumbago with sciatica, unspecified side; and diarrhea. (R. at 1031.) Gulley recommended that Sutton avoid lifting and stop smoking. (R. at 1031.)

Also, on December 27, 2017, Gulley completed a medical assessment, indicating that Sutton could lift and carry items weighing five pounds occasionally; she could stand and/or walk up to two hours total in an eight-hour workday, and she could do so for up to 10 minutes without interruption; she could sit up to two hours total in an eight-hour workday, and she could do so for up to 10 minutes without interruption; she could never climb, stoop, kneel, crouch or crawl and occasionally balance; she was limited in her ability to reach, to handle, to feel and to push/pull; and she could not work around heights, moving machinery, temperature extremes, chemicals, dust, noise, fumes, humidity and vibrations. (R. at 753-55.) Gulley opined that Sutton would be absent from work more than two days a month. (R. at 755.) Gulley noted Sutton's reported complaints as support for her assessment. (R. at 753-55.)

On January 12, 2018, Sutton presented to the emergency department for complaints of leg and knee pain and neuropathy in her hands and feet. (R. at 913-34.) Sutton denied arthralgia; back pain; myalgias; dizziness; weakness; numbness; headaches; abdominal pain; diarrhea; behavioral problems; and confusion. (R. at 916.) On examination, Sutton's musculoskeletal examination was normal; she had normal range of motion; she had no edema, tenderness or deformity; her muscle tone and coordination were normal; and her mood, affect and behavior were

normal. (R. at 917.) A chest x-ray was normal. (R. at 923-24.) Sutton was diagnosed with bronchitis; neuralgia of the lower extremity, unspecified laterality; and leg pain. (R. at 917.)

On February 19, 2018, Sutton presented to the emergency department for complaints of chest pain and pleurisy. (R. at 935-57.) She reported that she had cleaned her father's house the day prior, which made her chest pain worse. (R. at 936.) Upon examination, Sutton exhibited severe sternal tenderness; she had no back tenderness to palpation; her lower extremities had no tenderness, edema or erythema; and her mood, affect and behavior were normal. (R. at 938.) A chest x-ray was normal. (R. at 953.) An EKG also was normal. (R. at 955.) The physician noted that there were no findings to explain Sutton's symptoms. (R. at 939-40.) Sutton refused pain medication, stating that she would take over-the-counter ibuprofen. (R. at 940.)

On May 9, 2018, Sutton complained of bilateral lower extremity pain and headaches. (R. at 1024-26.) She also reported that her right knee "gives out," and she had frequent coughing and some depression. (R. at 1024.) Upon examination, Sutton's lungs were clear; her musculoskeletal and abdominal examinations were normal, other than knee crepitus; she was cooperative; she had a normal gait; she made good eye contact; her mood and affect had full range; her speech was clear; and her thought process was logical and goal directed. (R. at 1024.) Gulley diagnosed hypothyroidism and right knee pain, unspecified chronicity. (R. at 1024-25.) She recommended orthopedic consultation due to Sutton's bilateral leg pain and right knee instability. (R. at 1025-26.)  On May 23, 2018, Sutton complained of left foot pain. (R. at 1019.) Gulley noted that Sutton's lower left extremity had no redness or swelling; her pedal pulses were strong bilaterally; she had no restrictions with range of motion; she ambulated without difficulty; and she wore

shoes without difficulty. (R. at 1019.) The next day, Sutton presented to the emergency department for complaints of left foot pain. (R. at 958-60.) X-rays of Sutton's left leg and foot were unremarkable. (R. at 959-60.)

On August 23, 2018, Sutton reported low back pain and denied shortness of breath, anxiety and depression. (R. at 1017-18.) Upon examination, Sutton's lungs were clear; her extremities had no edema; she was alert and oriented; she made good eye contact; and her speech was clear. (R. at 1018.) She was diagnosed with dysuria. (R. at 1018.) On October 3, 2018, Dr. Joseph Smiddy, M.D., a physician with The Health Wagon, noted that Sutton's lung were clear; she had tenderness in the right upper abdominal quadrant on palpation; her musculoskeletal system had full range of motion with no swelling or deformity; her extremities had full range of motion with no edema; she was cooperative; her gait was normal; she made good eye contact; her judgment and insight were good; her speech was clear; her thought content was without suicidal ideation and delusions; and her thought process was logical and goal directed. (R. at 1014.) Dr. Smiddy diagnosed hypothyroidism, unspecified; adjustment disorder with depressed mood; right upper quadrant abdominal pain of unknown etiology; and adjustment disorder with anxiety. (R. at 1015.) Although Sutton accepted a prescription for anti-anxiety medication as needed, she stated that she would not go back to behavioral health sessions due to lack of insurance. (R. at 1015.)

On November 14, 2018, Sutton complained of tailbone, low back and knee pain. (R. at 1008-10.) She also reported some shortness of breath with exertion, occasional wheezing, frequent diarrhea, depression and anxiety. (R. at 1008.) Gulley noted that Sutton was uncomfortable due to pain and stood for most of the examination; her abdomen had bowel sounds, but no guarding or rigidity and only mild tenderness; her lungs were clear with good air movement and no wheezes,

rales or rhonchi; her back was tender to palpation over the lumbar-sacral spine; her straight leg raising tests were positive bilaterally; she had knee crepitus; her gait was normal; she was cooperative; she made good eye contact; her speech was clear; her thought process was logical and goal directed; she appeared anxious; and her mood was depressed. (R. at 1008-09.) Gulley diagnosed sacrococcygeal disorder, not elsewhere classified; adjustment disorder with anxiety and depressed mood; lumbago with sciatica, unspecified side; pain in unspecified knee; and hypothyroidism. (R. at 1009). She advised Sutton to avoid lifting, bending, crouching and kneeling. (R. at 1009.)

On November 15, 2018, Melinda M. Fields, Ph.D., a licensed psychologist, evaluated Sutton. (R. at 1044-49.) Sutton reported chronic worry, daily depressed mood, difficulty concentrating and loss of initiative. (R. at 1046.) Fields reported that Sutton's hygiene and grooming were good; her posture was stiff, and she appeared to experience discomfort, standing frequently and shifting in her seat; she was cooperative and appeared agitated; she had adequate eye contact; she spontaneously generated a great deal of conversation in a pressured fashion; her mood was depressed, as evidenced by facial expression and tearfulness; she was anxious and displayed hand tremors; her affect was restricted; her stream of thought was organized and logical; she displayed no evidence of thought content impairment or perceptual disturbances; her judgment was adequate; her immediate memory was within normal limits; her recent and remote memory were impaired; her concentration was impaired; and her pace was slow. (R. at 1047-48.)  Sutton reported eye pain and difficulty reading print on the assessments, stating, "My head is busting." (R. at 1048.) Fields diagnosed generalized anxiety disorder; major depressive disorder, recurrent; and unspecified somatic symptom and related disorder. (R. at 1048.) Fields recommended outpatient psychiatric treatment and psychotherapy to reduce and stabilize her symptoms; thus, Sutton was encouraged

to seek treatment. (R. at 1048.)

That same day, Fields completed a mental assessment, indicating that Sutton had no limitations on her ability to maintain personal appearance. (R. at 1050-52.) She opined that Sutton had a satisfactory ability to follow work rules; to use judgment in public; to interact with supervisors; to function independently; to understand, remember and carry out simple job instructions; and to demonstrate reliability. (R. at 1050-51.) Fields found that Sutton had a seriously limited ability to relate to co-workers; to deal with the public; to deal with work stresses; to maintain attention and concentration; to understand, remember and carry out detailed and complex job instructions; to behave in an emotionally stable manner; and to relate predictably in social situations. (R. at 1050-51.) She opined that Sutton would be absent from work more than two days a month due to her impairments. (R. at 1052.)

On November 16, 2018, Gulley completed a mental assessment, indicating that Sutton had no limitations in her ability to understand, remember and carry out simple job instructions and to maintain personal appearance. (R. at 1002-04.) She opined that Sutton had slight limitations in her ability to understand, remember and carry out detailed job instructions. (R. at 1002-03.) Gulley found that Sutton had between a slight to more than slight limitations in her ability to behave in an emotionally stable manner; to relate predictably in social situations; and to demonstrate reliability. (R. at 1002-03.) She opined that Sutton had a satisfactory ability to follow work rules; to use judgment in public; to interact with supervisors; to function independently; to maintain attention and concentration; and to understand, remember and carry out complex job instructions. (R. at 1002-03.) Gulley found that Sutton had serious limitations in her ability to relate to co-workers; and she had no useful ability to deal with the public and to deal with work

stresses. (R. at 1002-03.) Gulley opined that Sutton would be absent from work more than two days a month. (R. at 1004.) Gulley noted Sutton's reported complaints as support for her assessment, in addition to Sutton's report that she was being seen for behavioral health counseling.[7] (R. at 1002-04.)

Also, on November 16, 2018, Gulley completed a medical assessment, indicating that Sutton could lift and carry items weighing five pounds occasionally; she could stand and/or walk up to two hours total in an eight-hour workday, and she could do so for up to 10 minutes without interruption; she could sit less than one hour in an eight-hour workday, and she could do so for up to 10 minutes without interruption; she could never to occasionally climb, stoop and kneel; she could occasionally balance and never crouch or crawl; she was limited in her ability to reach, to handle, to feel, to push/pull and to see, which was corrected; and she could not work around heights, moving machinery, temperature extremes, chemicals, dust, noise, fumes, humidity and vibrations. (R. at 1005-07.) Gulley opined that Sutton would be absent from work more than two days a month. (R. at 1007.) Gulley noted Sutton's reported complaints as support for her assessment. (R. at 1005-07.)

### III.  Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2020). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a

---

[7] The record shows that Sutton participated in two behavioral health sessions, one on September 7, 2017, and another on October 2, 2017. (R. at 741-44, 747-51.)

listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2020).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Sutton argues that the ALJ erred by improperly determining her residual functional capacity by rejecting the opinions of Gulley and Fields. (Plaintiff's Memorandum In Support Of Her Motion For Summary Judgment, ("Plaintiff's

Brief"), at 6-7.) Sutton also argues that the ALJ erred by failing to find that she suffered from a severe mental impairment. (Plaintiff's Brief at 4-6.)

Because this matter involves a claim filed after March 27, 2017, a new regulatory framework applies to the ALJ's evaluation of medical opinions in the record. For applications filed on or after March 27, 2017, the Social Security Administration, ("SSA"), has enacted substantial revisions to the regulations governing the evaluation of opinion evidence. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)). Under the new regulations, ALJs no longer are required to assign an evidentiary weight to medical opinions or to accord special deference to treating source opinions. *See* 20 C.F.R. § 404.1520c(a) (2020) (providing that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources").[8]

Instead, an ALJ must consider and articulate how *persuasive* he finds all of the medical opinions and all prior administrative medical findings in a claimant's case record based on the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors that tend to support or contradict the opinion. *See* 20 C.F.R. § 404.1520c(b), (c)(1)-(5) (2020)

---

[8] The new regulations define a "medical opinion" as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the abilities to perform the physical, mental, or other demands of work activity or to adapt to environmental conditions. 20 C.F.R. § 404.1513(a)(2) (2020). Those regulations also define a "prior administrative medical finding" as a "finding, other than the ultimate determination about whether [a claimant is] disabled, about a medical issue made by [the SSA's] Federal and State agency medical and psychological consultants at a prior level of review." 20 C.F.R. § 404.1513(a)(5) (2020).

(emphasis added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he or she considered those opinions or findings "individually." 20 C.F.R. § 404.1520c(b)(1) (2020).

In evaluating the persuasiveness of an opinion or finding, the SSA deems supportability and consistency "the most important factors," and, thus, the ALJ must address those two factors in evaluating the persuasiveness of medical opinions or prior administrative medical findings. 20 C.F.R. § 404.1520c(b)(2) (2020).[9] In evaluating the supportability of a medical opinion, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) … the more persuasive the medical opinions … will be." 20 C.F.R. § 404.1520c(c)(1). In assessing the consistency factor, "[t]he more consistent a medical opinion(s) … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) … will be." 20 C.F.R. § 404.1520c(c)(2).

The new regulations also alter the way the ALJ discusses the medical opinions or findings in the text of the decision. *See* 20 C.F.R. § 404.1520c(b)(2). After considering the relevant factors, the ALJ is not required to explain how he or she considered each of them. Instead, when articulating his finding about whether an opinion is persuasive, the ALJ need only explain how he considered "the most important factors" of supportability and consistency. *See* 20 C.F.R. §

---

[9] "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(1). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(2).

404.1520c(b)(2). The ALJ may comment on the other factors, including the source's relationship with the claimant, but generally has no obligation to do so. *See* 20 C.F.R. § 404.1520c(b)(2)-(3) (2020).

When the ALJ finds two or more opinions or findings about the same issue are both equally well-supported and consistent with the record, but are not exactly the same, the ALJ must consider the most persuasive factors, including the nature and extent of the medical source's relationship with the claimant and area of specialization, as well at the catch-all "other factors that tend to support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R. § 404.1520c(b)(3), (c)(3)-(5).

Sutton argues that the ALJ erred by failing to find that she suffered from a severe mental impairment. (Plaintiff's Brief at 4-6.) The Social Security regulations define a "nonsevere" impairment as an impairment or combination of impairments that does not significantly limit a claimant's ability to do basic work activities. *See* 20 C.F.R. § 404.1522(a) (2020). Basic work-related mental activities include understanding, remembering and carrying out simple instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations and dealing with changes in a routine work setting. *See* 20 C.F.R. § 404.1522(b) (2020). Although the Social Security regulations do not define the term "significant," this court previously has held that it must give the word its commonly accepted meanings, among which are, "having a meaning" and "deserving to be considered." *Townsend v. Heckler*, 581 F. Supp. 157, 159 (W.D. Va. 1983). In *Townsend*, the court also noted that the antonym of "significant" is "meaningless." 581 F. Supp. at 159.

In evaluating the severity of mental impairments, the ALJ must first determine the degree of functional loss in four areas considered essential to the ability to work: (1) understanding, remembering or applying information; (2) interacting with others; (3) the ability to concentrate, persist or maintain pace; and (4) adapting or managing oneself. *See* 20 C.F.R. § 404.1520a(c)(3) (2020). These areas are rated on the following five-point scale: none, mild, moderate, marked and extreme. *See* 20 C.F.R. § 404.1520a(c)(4) (2020). The last point on the scale represents a degree of limitation that is incompatible with the ability to do any gainful activity. *See* 20 C.F.R. § 404.1520a(c)(4). If a claimant's degree of limitation in all of these areas is rated as "none" or "mild," the Commissioner generally will find that the claimant's impairment is not "severe" unless the evidence otherwise indicates that there is more than a minimal limitation in the ability to do basic work activities. *See* 20 C.F.R. § 404.1520a(d)(1) (2020).

Here, the ALJ found that Sutton had no to mild limitations in all four areas. (R. at 13-15.) The ALJ noted that, while Sutton had some reduced memory at her consultative examination, her treating practitioners generally did not note any issues with deficits in her long- or short-term memory and insight or judgment. (R. at 14-15.) The ALJ also noted that the record showed that Sutton interacted appropriately with her treating practitioners; she was pleasant, cooperative and in no distress; she made good eye contact; she spoke clearly; she was not distractible or slow;[10] and she had appropriate hygiene or attire. (R. at 14-15, 551, 674-75, 730, 1008-09, 1014, 1018, 1024, 1030, 1033-34, 1047-48.) Sutton indicated on her Function Report that she had no memory problems; she performed household activities; she socialized with family; she got along well with authority figures; she watched television; she paid bills; she could count change; she could handle a

---

[10] It is noted that Fields reported that Sutton's pace was slow. (R. at 1048.)

savings account and use a checkbook; she handled her own activities of daily living without assistance from others; and she took care of her elderly father. (R. at 14-15, 229-35, 745.)

Sutton also argues that the ALJ erred in his weighing of the medical evidence in assessing her residual functional capacity. In making this residual functional capacity finding, the ALJ applied the new regulations and addressed supportability by explaining that he found the opinions of the state agency psychologists "very persuasive." (R. at 13, 74-75, 88-89.) The ALJ noted that the state agency psychologists' opinions were consistent with the totality of the medical evidence, which showed that Sutton went to only a few sessions of counseling and occasionally reported some depression or anxiety symptoms to her primary care practitioners. (R. at 13.) In addition, the ALJ noted that the state agency psychologists supported their opinions with their summary of, and citations to, the objective medical evidence of record, including mental status examination findings and the very conservative treatment that Sutton received. (R. at 13, 74-75, 88-89.) The ALJ noted that Sutton did not want to take medication until she was prescribed Vistaril to use as needed for anxiety in 2018. (R. at 13, 1015.) The fact that a claimant received treatment is not sufficient to show a "severe impairment." *See Walker v. Comm'r of Soc. Sec.*, 61 F. App'x 787, 789 (3d Cir. 2003) (stating "the fact that he was on medication simply indicate[s] that he did have some depression, but do[es] not conflict with the ALJ's finding[] that the depression was not severe"). While it is noted that Sutton was diagnosed with an adjustment disorder with anxiety and depressed mood, (R. at 691, 731, 733, 1009, 1015, 1031), a mere diagnosis does not make an impairment "severe." *See Synder v. Berryhill*, 2017 WL 2273157, at *2 (W.D. N.C. May 24, 2017) (quoting *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) ("The mere diagnosis of [an impairment], of course, says nothing about the severity of the condition.")); *see also Hall v.*

*Colvin*, 2014 WL 988750, at *7 (W.D. Va. Mar. 13, 2014) (a "diagnosis alone is not evidence of a severe impairment").

The ALJ found the opinions of Fields and Gulley "not persuasive." (R. at 20-21.) The ALJ stated that Fields's opinion was inconsistent with the overall medical evidence of record. (R. at 20.) Sutton's medical practitioners routinely noted normal mental status. (R. at 20, 548, 593, 596, 604-05, 916-17.) Additionally, with the exception of Gulley's mental assessment, the times that a practitioner noted an issue with Sutton's mental status, it was mild, such as depressed mood or affect related to a situational cause of stress, such as the death of her mother, taking care of her elderly father and issues with her son. (R. at 20, 551, 594, 674-75, 741, 750, 1014.)

The ALJ noted that, while Fields opined that Sutton had marked limitations in several areas, she provided little support for her opinion. (R. at 20, 1050-52.) The ALJ also found that Gulley's November 16, 2018, mental assessment was "not persuasive" because her opinion was mostly based on Sutton's allegations, and it was inconsistent with the overall medical evidence of record. (R. at 21, 1002-04.) As noted above, Sutton's mental health treatment was very limited, and her mental status examinations were routinely normal. In addition, Sutton indicated that she had no memory problems; she performed household activities; she socialized with family; she got along well with authority figures; she watched television; she paid bills; she could count change; she could handle a savings account and use a checkbook; she handled her own activities of daily living without assistance from others; and she took care of her elderly father. (R. at 14-15, 229-35, 741, 745, 750.)

I also find it important to note that Fields's November 15, 2018, opinion and Gulley's November 16, 2018, opinion are contained in a check-box form, which

this court has found are not entitled to great weight. *See Cooper v. Saul*, 2019 WL 6703557, at *10 (W.D. Va. Oct. 29, 2019) (citing *Gerette v. Colvin*, 2016 WL 1296082, at *6 (W.D. Va. Mar. 30, 2016) (form reports, in which a physician's only obligation is to check a box or fill in a blank, are entitled to little weight in the adjudication process); *Walker v. Colvin*, 2015 WL 5138281, at *8 (W.D. Va. Aug. 31, 2015) (check-box forms are of limited probative value); *Ferdinand v. Astrue*, 2013 WL 1333540, at *10 n.3 (E.D. Va. Feb. 28, 2013) (check-box forms are weak evidence at best); *Leonard v. Astrue*, 2012 WL 4404508, at *4 (W.D. Va. Sept. 25, 2012) (check-box assessments without explanatory comments are not entitled to great weight, even when completed by a treating physician)). The ALJ noted that Sutton's treating practitioners never observed difficulty with social interaction or behaving in an unstable manner. (R. at 20.) Sutton reported that her mental conditions did not affect either her memory, her ability to concentrate or her ability to get along with others. (R. at 234.) Sutton's primary care practitioners usually noted normal mental status or only mild findings, such as depressed mood and affect. (R. at 20-21.)

The ALJ also found that Gulley's medical assessments, dated December 27, 2017, and November 16, 2018, were "not persuasive." (R. at 20, 753-55, 1005-07.) The ALJ found that Gulley based her opinion on Sutton's allegations and not on her own clinical observations or other objective evidence. (R. at 20.) At multiple emergency department visits throughout 2016, Sutton did not report musculoskeletal pains, and no issues were found upon examination. (R. at 444-45, 592-93, 596.) Gulley routinely reported that, although Sutton had crepitus in her knees and tenderness in her back, she had full range of motion, no swelling or deformity, and her gait was normal. (R. at 551, 674-75, 1008-09, 1018, 1024, 1030, 1033-34.)  In 2017 and 2018, Sutton denied joint, back or muscle pain and diarrhea, and examinations showed that Sutton was well hydrated and in no

distress; her abdomen had no guarding or rigidity; and she had a normal range of motion with no edema, tenderness or deformity. (R. at 674, 730, 916-17, 1014, 1030.) The ALJ found that Gulley's opinions were inconsistent with the medical evidence of record. (R. at 21.) While some medical records indicated some stiffness in Sutton's hands and reduced range of motion in her left shoulder, the ALJ addressed this in his residual functional capacity by limiting her fingering and feeling as well as overhead reaching. (R. at 21, 690-91, 732-33.)

Based on these findings, I find that substantial evidence exists to support the ALJ's finding that Sutton did not suffer from a severe mental impairment. I also find that substantial evidence exists to support the ALJ's residual functional capacity finding. An appropriate Order and Judgment will be entered.

DATED:    May 13, 2021.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE